IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: | * |
| | *   CASE NUMBER |
| HOLIDAY ISLE, LLC, | *   10-03365 |
| | * |
| Debtor. | * |

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Debtor, Holiday Isle, LLC, hereby files this Memorandum in Opposition to RBC-REFI's Motion to Dismiss and in support Debtor-in-Possession states the following:

On July 23, 2010, Debtor filed a Petition for Relief under Chapter 11 of the U.S. Bankruptcy Code (the "Filing Date"). The Debtor is serving as Debtor-in-Possession. The Debtor owns 81 residential condominium units and one (1) commercial condominium unit at the Holiday Isle Condominiums located at Dauphin Island, Alabama. The Debtor was the developer fo the condominium project. The Debtor is indebted to its secured creditor, RBC-REFI, which holds a mortgage on the units, in the estimated amount of $20,466,700.33 as of July 22, 2010 which sum includes principal, interest, attorney fees, and appraisal costs. The Debtor is indebted to the Mobile County Revenue Commission in the amount of approximately $851,000.00 and owes unsecured creditors, exclusive of The Mitchell Company, Inc., an an insider, approximately $1,267,820.00.

The Debtor values the inventory of condominium units, based on the sum of their current market values, assuming a sell out of those units over a period of time, at $24,134,450.00. The Debtor, and RBC-REFI's appraiser, Mr. Rogers, are of the opinion that prices for these units will increase with time.

-1-

The Debtor has previously filed a Chapter 11 proceeding in this Court, Case Number 08-14135, hereafter HI-1) and had its Plan of Reorganization confirmed by Order dated November 3, 2009. Under the confirmed Plan in HI-1, Debtor was to sell a specified number of units at a price no less than the prices stated on a Minium Release Price Schedule incorporated into the Plan and was to pay 85% of the net proceeds of each of these sales to RBC-REFI until the secured claim of RBC-REFI was paid in full. Failure to meet the sales requirements was deemed a Sales Default under the Plan. The remainder of the sales proceeds, including 100% of proceeds after RBC-REFI's secured claim was paid in full, was to be used to pay the costs of retaining and maintaining the unsold units (sometimes referred to as "holding costs")holding costs, selling costs, administrative claims, and unsecured claims. Upon the occurrence of a Sales Default, RBC-REFI is entitled to foreclose its mortgage on all remaining unsold units (HI-1 Plan, Doc. 423, Section 4.1, p. 13 of 23).

Between the confirmation date of the HI-1 Plan and the Horizon Drilling Platform explosion and subsequent oil leakage into the Gulf of Mexico, Debtor sold 5 of its units and paid RBC-REFI more than $1.1 million on its secured claim from the sales proceeds. Although the number of sales made and closed each post-confirmation month was less than the number required under the confirmed Plan, RBC-REFI wrote Debtor each month beginning in December, 2009, stating that Debtor was in Sales Default, but stating that RBC-REFI would not enforce its right to foreclose and would allow Debtor additional time to make and close additional sales. The last such letter bears the date of April 7, 2010 and concludes that this "unfulfilled quotes for sales contracts in prior months" as being deemed "as being carried over to April, 2010." (Exhibit 22). No written or oral communication contradicting these letters or

advising of a contrary course of action was sent or received by Holiday Isle, LLC until RBC-REFI wrote Debtor in early July, 2010 that a foreclosure sale was being advertised for July 23, 2010.

The explosion at the Horizon well and the subsequent leak began on April 20, 2010. The effect of the spill on the Dauphin Island, Alabama resort condominium sales and rental markets was devastating and cataclysmic. While oil was spewing into the Gulf, virtually no new (as opposed to existing Dauphin Island residents) purchasers came to Dauphin Island. At Holiday Isle, the traffic of interested lookers dwindled. The oil spill in the Gulf Mexico was an unanticipated change in circumstances that annihilated the market for Debtor's units and occurred at a point in time when Debtor's sales had substantially improved and were continuing to get stronger as was the real estate market at Dauphin Island as a whole. But for the fallout from the oil spill, Debtor conceivably would have ben able to achieve the required monthly mileposts under the Plan. The Debtor asserts it has a claim for damages against BP. It has not filed or calculated that claim. Payment of that claim will not reach Debtor in time to cure Debtor's default to RBC-REFI and prevent the foreclosure.

Shortly after the oil spill began and while the predictions for devastation of the entire Gulf Coast were rampant, RBC-REFI, without notice or warning to Debtor, apparently changed its previous policy of refraining from exercising its right to foreclose due to Holiday Isle's Sales Default under the HI-1 Plan and sent written notice of its publication in the Mobile newspaper of its foreclosure sale on all unsold units to be held on July 23, 2010. Debtor submits that the effects of the oil spill contributed to Debtor's inability to satisfy RBC-REFI's conditions for continuing to refrain from initiating foreclosure on the unsold units.

Case 10-03365    Doc 34    Filed 08/11/10    Entered 08/11/10 12:22:06    Desc Main
Document      Page 3 of 8

Debtor filed the instant Chapter 11 on July 22, 2010. At the time of filing, it owned the 81 residential units, the one (1) commercial unit, less than $13,000.00 in one account, $72,000.00 believed to be in another account, the claim against BP, and two sales agreements for two units. It is continuing to market the units and holds an open house every weekend, with advertising in the paper. All of its office expenses are paid for by its sole member, The Mitchell Company, Inc. Since the Horizon well has been capped, interest in purchasing units at Holiday Isle has increased and activity has been regenerated.

RBC-REFI has had the remaining units appraised as of March 21, 2010. The appraised value, if all units are sold in bulk at a single sale, is opined by the appraiser to be $14,600,000.00 (although the appraiser had in his file a report indicating a value of $16,500,000.00). This amount is less than the secured claim of RBC-REFI. If RBC-REFI's Motion to Dismiss is granted and the foreclosure sale occurs, none of the other creditors including the former administrative claimants in HI-1, will recover anything.

## **THE LAW**

RBC-REFI has filed a Motion to Dismiss the instant Chapter 11 because it's a serial filing or alternatively because RBC-REFI contends it was filed in bad faith. Debtor submits that the Motion should be denied.

Most courts have held that "there is no prohibition of serial good faith Chapter 11 filings in the Code - indeed, there is not even a time limit on successive filings parallel to that imposed on individuals or family farmers .... In Re Jartran, Inc. 886 F.2d 859, 870 (7th Cir. 1989).

In In re Casa Loma Assoc. 122 BR 814 (Bkrtcy. N.D. Ga 1991), The Debtor owned a 234 unit apartment complex in Clarkstone, Georgia. The Debtor's plan was confirmed in 1988, the

-4-

Debtor defaulted in payments in March, 1990, and the Debtor filed a second Chapter 11 in April, 1990. The Bankruptcy Court denied the creditor's motion to dismiss the second Chapter 11 and held:

> ...a serial filing of two Chapter 11 cases is permissible if the second case is filed in good faith and as a result of unforeseen changed circumstances...

In that case, the Court noted that a mere change in market conditions would not have been sufficient to support a second Chapter 11. However, Debtor showed unanticipated changes in circumstances, including a change in federal law which caused vacancies in its formerly all-adult apartment complex (a condition which affected the marketability of units in the complex) and the discovery of fire damage and structural defects at the apartment complex which required substantial expenditures to repair, all of which affected Debtor's ability to perform its Plan. Casa Loma Assoc. supports Debtor's contention that the BP oil spill was the type of unforeseen circumstances that allows the Debtor to file a second Chapter 11.

In Matter of Elmwood Development Company 964 F. 2d 508 (5th Cir. 1992), the Debtor owned a ten-story office building. In its first Chapter 11, the Debtor agreed to a deadline by which to satisfy the secured creditor's $18.7 million secured claim. The agreement described the secured creditor's remedies as being bankruptcy proof. The agreement was incorporated into the Plan. When Debtor missed the deadline, it filed a second Chapter 11. The Fifth Circuit affirmed finding that the successive filing was not in good faith. The Court held:

Even though the outcome is contrary to Debtor's position, the Fifth Circuit's statement of the law is supportive of Debtor's position. As to good faith, the Court held:

> Lack of good faith in the filing of a Chapter 11 bankruptcy petition constitutes cause for dismissal under 11 U.S.C. § 1112(b). The good faith standard protects

-5-

the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws. The good faith determination depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realties. A collation of factors, rather than any single datum, controls resolution fo this issue. In determining whether a petition was filed with the requisite good faith, the court must examine the facts and circumstances germane to each particular case.
at 511

As to the issue of successive filings, the Court reasoned as follows:

...We conclude that the mere fact that a debtor has previously petitioned for bankruptcy relief does not render a subsequent Chapter 11 petition... Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceeds. ... In 1987 Elmwood bargained for three years in which to sell or refinance its property, granting an absolute deadline after which GEPT could proceed undisturbed with a foreclosure of Elmood Towers. After reaping the benefit of its bargain Elmwood sought to avoid its solemn obligation by filing *Elmwood II*. ... Elmwood maintains that changed circumstances justify the filing of the second petition. We agree that unanticipated changed circumstances may justify a valid successive request for Chapter 11 relief. In that instance, a second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief.
at 512

The Court then proceeded to examine the factors which Elmwood contended demonstrated a change in circumstances. The Court agreed with the Bankruptcy Court that none of those factors constituted changed circumstances sufficient to justify the second Chapter 11. In the case at bar, the Debtor truly experienced circumstances which it could not have anticipated and which prevented it from complying with the opportunity to cure its defaults extended by RBC-REFI. While the outcome of Elmwood is not supportive, application of its principles to the facts in this case lead to the conclusion that the second Chapter 11 filing should be allowed and RBC-REFI's Motion to Dismiss denied.

In 1633 Broadway Mars Restaurant Corp., 388 B.R. 490 (Bkrtcy. S.D. N.Y. 2008) a restaurant filed a second Chapter 11 after it failed to timely build a cooling tower for the leased space it occupied in a multi-story building as provided for in a revised lease assumed in its confirmed Chapter 11 Plan in the first case. The Bankruptcy Court denied the Landlord's motion to dismiss for bad faith filing and cited the following:

> Notwithstanding the importance of protecting the integrity of the reorganization process, there are exceptions to the rule against serial filings. Second reorganization cases that would modify earlier plans have been permitted on a showing of unanticipated changes in circumstances that were not foreseeable at the time the first plan was confirmed. *See Elmwood*, 964 F2d at 511, *Tillston* 266 BR at 569 citing *In re Adams* 218 BR 597 (Bank D. Kas 1998), *Northtown Realty Co.* 215 BR at 911. As the Circuit Court stated in *Elmwood* 'A second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief. *Elmwood* 964 F2d, at 511-12. The debtor must have a genuine need to reorganize, and these unforseen changes in circumstance must contribute to the debtor's default under its obligations from the earlier bankruptcy. However, so as not to undercut § 1127(b), 'courts construe the concept of material change in circumstances quite narrowly. Citations omitted. 388 BR at 501.

The Bankruptcy Court reasoned that performance of the obligation undertaken in the lease was not an "integral" part of the confirmed plan in the first Chapter 11 filing. The Court therefore denied the motion to dismiss.

Similarly in the case at bar, RBC-REFI had extended voluntarily the deadlines for sales and closings regardless of the language of the Plan. Performance by the deadlines was not an integral part of the confirmed plan in HI-1. Debtor's failure to comply with the modified deadlines was due solely to the unanticipated BP oil spill. RBC-REFI's Motion to Dismiss should be denied under the rationale of 1633 Broadway Mars Restaurant Corp.

Case 10-03365    Doc 34    Filed 08/11/10    Entered 08/11/10 12:22:06    Desc Main
Document      Page 7 of 8

Respectfully submitted,

/s/Irvin Grodsky
IRVIN GRODSKY
Attorney for Debtor
Post Office Box 3123
Mobile, Alabama 36652
(251) 433-3657

**CERTIFICATE OF SERVICE**

On this the 11th day of August, 2010, I hereby certify that the above and foregoing document has been served via United States Mail, properly addressed and first-class postage prepaid or court electronic mailing on the following:

W. Alexander Gray, Esq.
Attorney at Law
Silver, Voit & Thompson
4317-A Midmost Drive
Mobile, Alabama 36609

Mark S. Zimilch, Esq.
Office of U. S. Bankruptcy Administrator
Post Office Box 3083
Mobile, Alabama 36652-3083


/s/ Irvin Grodsky
IRVIN GRODSKY

-8-